1

2  UNITED STATES BANKRUPTCY COURT

3  EASTERN DISTRICT OF NEW YORK

4  Case No. 09-48910 (CEC)

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  MARTENSE NEW YORK, INC.,

9

10          Debtor.

11

12  - - - - - - - - - - - - - - - - - - - - -x

13

14                  United States Bankruptcy Court

15                  271 Cadman Plaza East

16                  Brooklyn, New York

17

18                  January 6, 2011

19                  1:48 PM

20

21  B E F O R E:

22  HON. CARLA E. CRAIG

23  CHIEF U.S. BANKRUPTCY JUDGE

24

25

1

2    HEARING re [5] Order Scheduling Status Conference for the

3    Purpose of Determining an Appropriate Schedule for the Proper

4    Administration of the Case.

5

6    HEARING re [19] Motion for Relief from Stay Real Property

7    Located at 61 Martense Street, Brooklyn, NY 11226.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Pnina Eilberg

25

1

2   A P P E A R A N C E S :

3   GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP

4           Attorneys for Debtor

5           1501 Broadway

6           New York, NY 10036

7

8   BY:   NEAL M. ROSENBLOOM, ESQ.

9

10

11  LYNCH & ASSOCIATES

12          Attorneys for New York Community Bank

13          402 Seventh Avenue

14          12th Floor

15          New York, NY 10018

16

17  BY:   GARY O. RAVERT, ESQ.

18

19

20

21

22

23

24

25

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3          Office of the United States Trustee

4          271 Cadman Plaza East

5          Suite 4529

6          Brooklyn, NY 11201

7

8    BY:    WILLIAM E. CURTIN, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2         THE COURT:

3         MR. ROSENBLOOM:  Good afternoon, Your Honor.

4         THE COURT:  Good afternoon.

5         MR. ROSENBLOOM:  Your Honor, this is the adjourned

6    hearing on the bank's motion to --

7         THE COURT:  Yes.

8         MR. ROSENBLOOM:  -- vacate the automatic stay.  When

9    we were last here --

10        THE CLERK:  State your name, please?

11        MR. ROSENBLOOM:  Excuse me?

12        THE COURT:  You've been asked to state your name for

13   the record.

14        MR. ROSENBLOOM:  Oh, I'm sorry.  Neal Rosenbloom,

15   Goldberg Webrin Finkel Goldstein, attorneys for the debtor.

16        THE COURT:  Go ahead, please.

17        MR. ROSENBLOOM:  When we were last here we were

18   beginning the testimony of Victory Schlesinger to rebut the

19   valuation set forth in the bank's appraisal and we're prepared

20   to resume that testimony.

21        THE COURT:  You may call your witness.

22        MR. CURTIN:  Your Honor, excuse me.  William Curtin

23   for the United States Trustee.

24        I was here because the status conference was on the

25   calendar.  Would it be okay if I'm excused from the testimony?

1          THE COURT:  Well, why don't we get a quick status,

2    then, and then you're excused.

3          MR. CURTIN:  Okay.  Thank you, Your Honor.

4          THE COURT:  Go ahead.

5          MR. ROSENBLOOM:  Your Honor, this really is the

6    essence of the debtor -- the status of the debtor's case.

7          THE COURT:  Well is the debtor paying its -- paying

8    the secured creditor?

9          MR. ROSENBLOOM:  Yes.

10         THE COURT:  You've paid the adequate protection

11   payment each month?

12         MR. ROSENBLOOM:  Yes we have, Judge.

13         THE COURT:  Okay.  Have you filed all your operating

14   reports?

15         MR. ROSENBLOOM:  No, Judge.  Mr. Curtain advises me

16   that we are two months behind in our operating reports and I

17   advised him that we would have that remedied by the end of next

18   week.

19         THE COURT:  And is this property -- this is a property

20   that is not fully rented up, is that correct?

21         MR. ROSENBLOOM:  No, Your Honor.  This property is

22   fully rented up.

23         THE COURT:  Okay.  All right.  And what is the rent

24   roll, if you can remember?

25         MR. ROSENBLOOM:  I am standing here -- in our

1  opposition to the bank's motion we had set forth what the rent

2  roll is --

3      (Pause)

4      MR. ROSENBLOOM:  The debtor's present rent roll is

5  approximately 63,000 dollars per month.

6      THE COURT:  And what's the amount of the mortgage

7  payment?

8      MR. ROSENBLOOM:  24,450 dollars per month.

9      THE COURT:  What is the amount of the arrears?

10      MR. ROSENBLOOM:  We have been current since April of

11  this year.  The bank's motion to vacate the stay, in the most

12  general fashion, alleges the principal amount of the mortgage

13  plus arrears and does not specify the exact amount of the

14  arrears.

15      THE COURT:  Has that proof of claim been filed?

16      MR. RAVERT:  Yes.

17      THE COURT:  You did have a bar date, correct?

18      MR. RAVERT:  Gary Ravert, of counsel for Lynch &

19  Associates for New York Community Bank.

20      Yes, Your Honor, proof of claim is filed.  I have

21  copies here if anyone would like a copy.  I can give you an

22  approximate number of the arrears.

23      THE COURT:  Well, why don't you tell me the proof of

24  claim amount?

25      MR. RAVERT:  The proof of claim amount is

1    $5,837,633.06 and that was accurate as of 10/13 of '10.

2           THE COURT:  And it shouldn't have increased if in fact

3    they're staying current?

4           MR. RAVERT:  It could have increased on account of

5    other things.  For example, any advances the bank may have made

6    on account of real estate taxes or any other charges along

7    those lines.

8           THE COURT:  Why would they be advancing real estate

9    taxes in bankruptcy?  They should -- I mean, the debtor should

10   be paying those.  Is there some reason to think the debtor's

11   not paying the real estate taxes?  And this isn't an escrow

12   loan?

13          MR. RAVERT:  It was escrow -- I don't believe the

14   escrow is factored into the adequate protection payments.

15          MR. ROSENBLOOM:  Well, Your Honor, we did -- this was

16   something that was raised earlier.  We did pay the installment

17   of taxes that was due in July.  And I --

18          THE COURT:  And they were advanced?

19          MR. ROSENBLOOM:  They were not advanced.

20          THE COURT:  They were not advanced, okay.

21          MR. ROSENBLOOM:  They were not advanced, they were

22   paid by the client.

23          THE COURT:  Oh, they were paid.  Okay.

24          MR. ROSENBLOOM:  They were not advanced.

25          THE COURT:  Okay.  So are you aware of any advances

1   that were made?

2          MR. RAVERT:  I'm not.  There was -- not that --

3   anything that would not have been already included in the proof

4   of claim, no I'm not.

5          THE COURT:  Okay.

6          MR. RAVERT:  So I think that number's accurate.

7          THE COURT:  Okay.  And -- there was no transcript

8   ordered of the last hearing so if you could -- I didn't get a

9   chance to refresh, you know, my recollection of what happened

10  the last time.  What was your -- what's your valuation of the

11  property?

12         MR. RAVERT:  $4,525,000.

13         THE COURT:  And what other claims are there?  What do

14  the proofs of claim -- in other words, what is the rest of the

15  debt that we're dealing with here?

16         MR. ROSENBLOOM:  The unsecured debt, Your Honor?

17         THE COURT:  Or any -- and any other -- well, I assume

18  there's no other mortgage on the property, right?

19         MR. ROSENBLOOM:  That's correct.

20         THE COURT:  So any other -- any priority debt or the

21  like, unsecured or other debt other than the secured claim.

22         MR. ROSENBLOOM:  There was -- I don't want to

23  misspeak.  I believe, Your Honor, there was approximately a

24  million dollars of other debt, a significant portion of which

25  was insider debt.

1      MR. CURTIN:  It's actually about 3.2 million in

2 priority and general unsecured that's scheduled.  But again, a

3 large majority of that was insider.  There were some non-

4 insider creditors.

5      THE COURT:  Anybody have a number for the non-insider

6 creditors?

7      MR. CURTIN:  I'm sorry, Your Honor?

8      THE COURT:  Is there a number that we can assign for

9 the non-insider creditors?

10      MR. CURTIN:  It looks like about seven creditors,

11 roughly 50,000 dollars.  Actually, no, and HPD is listed as an

12 unsecured creditor, disputed unsecured creditor in the amount

13 of 73,000 dollars.  So add that to the -- what looked like

14 trade, construction-type creditors.

15      THE COURT:  There's a Department of Taxation and

16 Finance claim.

17      MR. CURTIN:  Priority claim too, right.

18      THE COURT:  That's about 100,000 all together.

19      MR. ROSENBLOOM:  I would think, Judge, that the

20 Department of Finance claim is probably real estate taxes.

21      THE COURT:  Right.  Okay.  So that is -- well there's

22 two, there's the Department of Taxation and Finance and City of

23 New York.

24      All right.

25      (Pause)

1      MR. CURTIN:  Your Honor, it's the 135 for the priority

2  state tax, 75,000 for HPD and just about 60,000 in other

3  creditors, the largest of which is Castle Oil, which is

4  disputed at 55,000.

5      THE COURT:  Okay.  Thank you, Mr. Curtin.  So that

6  means that we're making the assumption here, I'm making the

7  assumption, that the tax claim and HPD claim would have to be

8  paid -- would have to be treated as unimpaired.  They would

9  have to be -- they couldn't be -- they would require payment

10  immediately.  So you're really talking about 60,000 dollars in

11  other unsecured claim so that --

12      MR. ROSENBLOOM:  Correct.

13      THE COURT:  So if there is any deficiency of any

14  significance at all, then the -- there is no plan possible

15  without the secured creditors' consent and that is the reason

16  for the valuation issue, correct?

17      MR. ROSENBLOOM:  Correct.

18      THE COURT:  All right.  Anything else that you want to

19  tell me about status?

20      MR. ROSENBLOOM:  No, Your Honor.

21      THE COURT:  Do you have a plan?

22      MR. ROSENBLOOM:  Not as yet, Your Honor.  The client

23  is looking for investors and trying to explore other financing

24  options but as we're standing here I have nothing definitive to

25  report to the Court.

1    THE COURT:  I have to say that I find it surprising

2    that given that we had -- this matter was adjourned since

3    October and this case has been pending since October of last

4    year, that your client didn't take advantage of these three

5    months to file a plan of reorganization which might have mooted

6    out this entire lift-stay issue.

7    MR. ROSENBLOOM:  Your Honor, one would have to file

8    with a plan a disclosure statement.

9    THE COURT:  Correct.

10    MR. ROSENBLOOM:  And I would have -- as I'm standing

11    here I don't have replacement financing.  I don't have the

12    investors that are prepared to sign on the dotted line to

13    commit to the funds that are needed in order to confirm a plan,

14    ergo why there has been no plan or disclosure statement filed.

15    THE COURT:  Right.

16    MR. ROSENBLOOM:  We do believe that the value of the

17    property exceeds the amount that's owed to the bank and we're

18    prepared to show that.

19    THE COURT:  All right.  Anything else you want to put

20    on the record, anyone wants to put on the record?

21    MR. RAVERT:  No, Your Honor.

22    MR. CURTIN:  No, Your Honor.

23    THE COURT:  You're excused, Mr. Curtin.

24    MR. CURTIN:  Thank you, Your Honor.

25    (Mr. Curtin excused)

1      THE COURT:  Call your witness, please.

2  (Witness duly sworn)

3      THE CLERK:  Please speak and spell your name for the

4  record, then be seated.

5      THE WITNESS:  Victor Schlesinger, S-C-H-L-E-S-I-N-G-E-

6  R.

7      MR. ROSENBLOOM:  Before we begin, does Your Honor --

8  when we were last here I see that Your Honor does have the

9  photographs which were admitted into evidence when Mr.

10  Schlesinger was last here.

11      THE COURT:  Yes, Debtor's Exhibit 1.

12      MR. ROSENBLOOM:  Correct.

13  DIRECT EXAMINATION

14  BY MR. ROSENBLOOM:

15  Q.   Mr. Schlesinger, you were -- when you were last called and

16  you last testified you indicated that you did visit the

17  building and do you recall Exhibit 1, the photographs that you

18  had taken?

19      MR. ROSENBLOOM:  Your Honor, is it necessary for me --

20  does Your Honor have notes or recollections of Mr.

21  Schlesinger's testimony?  I know it was almost two months ago.

22      THE COURT:  As I said, there was no transcript ordered

23  so I have not had -- I have not reviewed the testimony from the

24  last time.

25      MR. ROSENBLOOM:  All right.

1      THE COURT:  So --

2      MR. ROSENBLOOM:  Maybe we should spend a couple of

3   moments just --

4      THE COURT:  It's up to you, how you want to handle it.

5      MR. ROSENBLOOM:  Fine.

6   Q.   Mr. Schlesinger, do you have a copy of Exhibit 1, the

7   photographs?

8   A.   Yes, I do.

9   Q.   You do have a copy of it, fine.  Would you describe, in

10  your own words, what Exhibit 1 is?

11  A.   Exhibit 1 is the subject, pictures of 61 Martense Street

12  that I inspected.  In the interior, I was able to go in, these

13  are the pictures.

14  Q.   And if you could, there are a number of pages that make up

15  Exhibit 1.  I believe there are eight pages.

16  A.   That's correct.

17  Q.   Could you quickly, just for the sake of renewing the

18  record, would you please describe what each page is of Exhibit

19  1.

20  A.   Exhibit 1, the front page, is the lobby as you come into

21  the building, that's on the left side on the top.  The middle

22  one is a street view, the front of the subject.  The top right

23  photo is the entrance to the garage; the subject has an indoor

24  garage below ground.

25      The second line is the entrance again, from the outside to

1  the garage; it's on the right side in the middle.  The middle

2  picture is a street view facing east.  Then you have the

3  elevator, it's a picture of the front of the elevator.

4      On the bottom is, again, a picture of the subject, a

5  street photo from the subject.  Then you have your intercom

6  pictures and then the bottom left is the picture of the roof.

7  Q.   All right.  What -- how would you describe the condition

8  of the building?

9  A.   The condition of the property that I inspected was -- I

10  would describe it as average.

11  Q.   And what does average mean?

12  A.   Average means it's a rental apartment building and it

13  means average to good.  It's taken care of.  It's a building

14  that has a super, it's a building that has a manager and it's a

15  building that has been up kept.

16  Q.   Let's go to the second page.

17  A.   Okay.

18  Q.   Would you describe for us what the second page of Exhibit

19  1 is?

20  A.   Yeah.  To the top right is, again, a picture of the roof.

21  Then the middle on is again a picture of the roof and the

22  last -- the left-top is a view from the roof.

23      Second, in the middle is a roof picture, to the right and

24  the middle picture is again a roof picture and it's all -- it's

25  the roof pictures.

1    Q.    Okay.  And --

2    A.    It shows you the pointing, some pointing.

3    Q.    How would you describe the condition of the roof?

4    A.    As good.

5    Q.    And how about the pointing on the roof area?

6    A.    The description is as good.  There was some recent work

7    that was done and as you could see in the picture, on the

8    bottom to the right, construction material that they had some

9    recent repairs or -- I mean upkeep stuff done to the roof.

10   Q.    Uh-huh.  All right.  Let's turn to page 3.

11   A.    Page 3 to the top is the courtyard of the building,

12   showing the pointing of bricks.  The second picture -- the

13   middle picture on the top is again the brick pointings, then to

14   the left is an interior from a unit.  I was able to get inside

15   five apartments and I took some photos from the interior.

16         The middle picture, below that, is from an inside again.

17   There you have, again, some pointing pictures on the roof

18   that's the courtyard, the pointing of the bricks.  And then you

19   have another interior picture on the inside, from bathroom.

20   Q.    Let's go on to the fourth page, if we may?

21   A.    Page 3?

22   Q.    Page 4.

23   A.    Page 4, okay.

24   Q.    Would you please describe what page 4 depicts?

25   A.    The interior -- page 4 -- I have -- which -- is this --

1  I'm up to page 3.

2  Q.   You're up to page 3, I'm sorry.  Did I -- I thought you

3  were -- page 2 is the roof, almost exclusively the roof.

4  A.   Right.

5  Q.   Page 3 --

6  A.   Is the interior.

7  Q.   -- was the exterior pointing, was it not?  Maybe we're not

8  in the same order.

9       (Pause)

10  Q.   All right.  This would be page 3.

11  A.   I have this as page 2.

12       THE CLERK:  Mr. Rosenbloom, you have to speak louder

13  or make sure you speak into the mic.

14       MR. ROSENBLOOM:  I'm sorry.

15       (Pause)

16       MR. ROSENBLOOM:  Excuse me, Your Honor.  I just want

17  to make sure that we're all talking about the same thing.

18       (Pause)

19       THE COURT:  Okay.  Go ahead.

20  Q.   Mr. Schlesinger, take a look at page 4 and describe for us

21  what page 4 depicts.

22  A.   Page 4 is an interior, a living room, of a unit that I was

23  able to get into, on the top that's to the right.  Then in the

24  middle that's the hallway that goes into that unit.  On the top

25  left there's a bedroom, some hardwood floors.

1       The second line to the right there's a hallway.  Middle --

2   second line to the middle is a living room and the second line

3   to the left is a bathroom.

4       The bottom right is a hallway of the building.  The middle

5   picture on the bottom is a kitchen.  The left picture on the

6   bottom is a bedroom of a unit.

7   Q.   And how would you describe the condition of the apartments

8   which you observed?

9   A.   Average to good.

10  Q.   And how did you determine -- how did you gain access to

11  these apartments?

12  A.   I knocked on doors.

13  Q.   Were these appointments prearranged --

14  A.   No.

15  Q.   -- with any of the residents?

16  A.   No.

17  Q.   Let's go to the next page, I believe that would be page 5.

18  A.   Okay.

19  Q.   And would you tell us what that depicts?

20  A.   Okay.  That page is from the interior of a unit that I

21  went in.  On the top right pictures a living room.  The middle

22  is a kitchen.  To the left is a unit that had recently had new

23  parquet -- I mean new hardwood floors installed, that's on the

24  left top.

25      Then the middle line, to the right, is a living room

1  picture of a unit that was recently repainted so it smelled of

2  fresh paint.  Then the kitchen.  Then the middle, to the left,

3  is a bathroom.

4      The bottom right is a bathroom, the middle is a bedroom

5  that had some new hardwood floors installed and to the left is

6  another bedroom that had some new hardwood floors installed.

7  Q.   Let's go on to the next page.

8  A.   The next page at the top is a kitchen that -- at the top -

9  -

10 Q.   According to my review, I think the next page would be the

11 meter room.

12 A.   To the left the meter room?

13 Q.   Yes.  Yeah, we're starting with the left.  I think that's

14 where the confusion arises.

15 A.   Okay.  Top left is a meter room that's in the basement.

16 Each unit has its separate meters and they pay their own

17 electricity.  To the middle top picture that's the boiler and

18 to the right top picture is a kitchen from an interior unit

19 that I went in.

20     The second line --

21 Q.   Go ahead.

22 A.   -- is the gas meters in the basement to the left.  Each

23 unit has its own gas meters.  Then there's a picture, to the

24 middle, I took from the control.  It's an energy-saving type of

25 boiler so I took a picture of that.  Then there's another

1    picture of a bathroom from a unit.

2         And to the bottom left you have some meters for the gas

3    that's in the basement and it's another boiler picture taken at

4    an angle.  Then the bottom right picture is the lobby of the

5    building.

6    Q.   Go ahead.  I'm sorry, are you finished?

7    A.   That's the lobby of the building.

8    Q.   Right.  Okay.  Let's talk about what I'll call the guts of

9    the building which this series of photos depict.  How would you

10   describe the condition of the, shall I say, the boiler and the

11   guts, the meters and the equipment in the building?

12   A.   As good.  It has been -- as it appeared that -- what I was

13   able to observe that the upkeep is good.  The maintenance was

14   there.  It was clean.  The controls were working so my

15   experience in the past, I would describe that as good.

16   Q.   All right.  Let's flip the page to the next page, which I

17   believe is page 7.

18   A.   Page 7 to the top is the rear of the building.  You could

19   see the porches, a lot of these units have patios, porches and

20   you also see the fire escapes.  And on the bottom there's,

21   like, a courtyard that's a private courtyard that the building

22   has.

23        The second picture is again showing the porches and the

24   courtyard and the picture to the right on the top is the

25   laundry room, it's a picture of the laundry room in the

1  basement.  The building has its own laundromat.

2      The second line to the left is the pointing showing you

3  the brick pointings that looked quite good condition-wise.  The

4  middle picture is, again, showing the back of the building.

5      The left -- the right picture -- the middle picture -- I

6  mean the middle line, right picture is again the pointing of

7  the building to the back.  The left picture on the bottom is

8  again the bricks pointing.  The bottom picture in the middle

9  is, again, from the back -- from the rear of the building and

10  as is the bottom right picture.

11  Q.   And how would you describe the condition of the pointing

12  in the building?

13  A.   As good.

14  Q.   The last page, the two photographs on the last page?

15  A.   The last page is the front of the building as you go into

16  the lobby from the street and the picture below that is the

17  corner of the block, that's on Bedford Avenue, showing you the

18  neighborhood.

19  Q.   Now Mr. Schlesinger, when you were last here and you

20  testified, I believe you described yourself as a review

21  appraiser?

22  A.   That's correct.

23  Q.   Would you explain what a review appraiser is?

24  A.   A review appraiser looks through reports that banks,

25  clients that we have send us in to review the correctness of

1 real estate appraisal reports. I have been doing that ever

2 since -- for close to twenty years actually and I would

3 describe at least sixty or maybe even seventy percent of my

4 work is review-type of work.

5 Q. Uh-huh. And over the course that you've been an appraiser

6 how many appraisals have you reviewed?

7 A. North of 10,000 --

8 Q. Okay.

9 A. -- reports.

10 Q. And let's talk about the appraisal that was done by Mr.

11 Zachary that's been admitted into evidence as Bank's Exhibit 1.

12 Do you have a copy of that appraisal?

13 A. Yes, I do.

14 Q. And have you reviewed that appraisal?

15 A. Yes, I did.

16 Q. And have you prepared an analysis of that appraisal?

17 A. Yes, I did. I prepared an analysis, a short analysis, of

18 my review -- of the findings in my review.

19     (Pause)

20 Q. Mr. Schlesinger, I show you a document which is dated

21 October 25, 2010. Would you look at that document, please?

22 A. Yes.

23 Q. Can you identify it for us?

24 A. Yes, this is my conclusion of the review -- of Mr.

25 Zachary's appraisal report.

1    Q.    Okay.

2    A.    That I signed.

3            MR. ROSENBLOOM:  Can I have this marked?

4            THE CLERK:  Speak into the mic.

5            MR. ROSENBLOOM:  I'm sorry.  Can we have this marked?

6    I believe it would be Debtor's Exhibit 2.

7            MR. RAVERT:  I'm going to object, Your Honor.  We

8    received a copy of this just before the hearing.  It's dated

9    October 25th.  I do not object to Mr. Rosenbloom using it as a

10   guide in his questioning.  I do object to it being admitted

11   into evidence.  We haven't had a chance to review it.  Mr.

12   Zachary has not had a chance to review it.

13           To the extent that they want to use this as a guide in

14   his questioning, treat it as his own notes and ask questions

15   about it, that's one thing.  It's another thing to admit this

16   into evidence for the truth of what's contained in here.

17           MR. ROSENBLOOM:  All right.

18           MR. RAVERT:  We haven't had a chance to review it.  We

19   haven't prepared questions in connection with it.

20           MR. ROSENBLOOM:  It's a total, Judge, of three pages.

21   It's based upon Mr. Zachary's own report.  I think that by

22   having it --

23           THE CLERK:  Mr. Rosenbloom, please step up to the mic.

24           MR. ROSENBLOOM:  By having it, it is -- it will

25   facilitate Mr. Schlesinger's testimony.

1    THE COURT:  Well, do you want to -- are you seeking to

2    -- you heard counsel, Mr. Ravert, say that he is -- he does not

3    object to your -- the witness referring to this as and using it

4    as a guide for his testimony but that he objects to it being

5    introduced as an exhibit for the truth of what is contained in

6    it.  Do you have an objection to using it in the limited

7    fashion that he's willing to consent to?

8    MR. ROSENBLOOM:  I can certainly consent to allowing

9    it as a guide.  I don't admit it -- I don't ask the Court to

10   accept it for the truth of --

11   THE COURT:  Then do we need to mark it?

12   MR. ROSENBLOOM:  Excuse me, Your Honor.

13   THE COURT:  Do we need to mark it as an exhibit?

14   MR. ROSENBLOOM:  No, I don't -- I mean, the Court can

15   draw its own conclusions from this.  Do I need it in order to -

16   -

17   THE COURT:  He's saying you can't use it as an exhibit

18   so why are we marking it?  Why am I looking at it if it's not

19   going to be an exhibit?

20   MR. ROSENBLOOM:  Okay.  Fair enough.  Fair enough.

21   THE COURT:  If he doesn't mind that you use it as

22   notes then I guess that's what you had better use it for.

23   MR. ROSENBLOOM:  That's fine.

24   THE COURT:  Because I am sympathetic to the idea that

25   they should have been -- that if it was prepared in October you

1    could have given it to them in advance of today.

2         MR. ROSENBLOOM:  That's fine, Your Honor.

3    BY MR. ROSENBLOOM:

4    Q.   All right.  Mr. Schlesinger, you've indicated that you

5    have reviewed Mr. Zachary's report.

6    A.   That's correct.

7    Q.   And did you find, as a review appraiser, any glaring

8    deficiencies in that report?

9    A.   The way we look at reports or we get reports into our

10   offices for review is always we start out with reviewing those

11   reports by looking at items that are not usual.

12        When I first looked at Mr. Zachary's report on page 1 he

13   has that he only did an external inspection.  That was like a

14   red flag for us to continue, of course, looking into the report

15   deeper and that's what we did.

16   Q.   Uh-huh.  Is it typical that appraisals are prepared by

17   external review?

18   A.   No, it's not.

19   Q.   Have you ever prepared an appraisal based upon an external

20   review only?

21   A.   Of course.  There are circumstances where there is no way

22   of going inside a building, in divorce cases sometimes where

23   plaintiff or the other side doesn't allow.  So there are

24   situations where there is no choice and you have to do an

25   external -- there's no other way but an external report but

1    that's definitely not the usual case.

2    Q.   Have you ever prepared an external appraisal to be used in

3    connection with a court hearing?

4    A.   Yes, I did.

5    Q.   And what were the circumstances of that?

6    A.   As I said, there was no other way of going into the

7    property so we had no choice of doing that, no other choice.

8    Q.   All right.  Did you spend any time analyzing the cap rate

9    that Mr. Zachary used in determining the value of this

10   building?

11   A.   Yes, I did.

12   Q.   Uh-huh.  And what did you determine as a result of that

13   analysis?

14   A.   The result, the final result, was that Mr. Zachary's cap

15   rate is really pushing on the high side.

16   Q.   What was his cap rate?

17   A.   Mr. Zachary's cap rate was seven and a half percent.

18   Q.   Uh-huh.  And by having a high cap rate, what does that do

19   to the value of the building?

20   A.   The higher the cap rate, the lower the value.

21   Q.   Now Mr. Zachary gave four comps in his report, did he not?

22   A.   That's correct.

23   Q.   Have you analyzed those comps?

24   A.   Yes, I did.

25   Q.   And let's talk about, if we may, comp number one.

1   A.   Okay.

2   Q.   Are you familiar with a service called, I believe it's

3   Comps Inc?

4   A.   Comps Inc., yes I am.

5   Q.   And Mr. Zachary testified that he had used that service.

6   A.   He's utilizing the same service, yes.

7   Q.   You utilize that same service?

8   A.   That's correct.

9   Q.   And did you go onto Comps Inc to review the first comp?

10   A.   Yes.  Usually what we do is we use the same data carriers

11   that the appraiser states, so like this we can always double

12   check and confirm the accurate numbers.

13         MR. ROSENBLOOM:  I'd like to have this marked for

14   identification as Debtor's Exhibit 2.

15   (Printout of Comps Inc. was hereby marked as Debtor's Exhibit 2

16   for identification, as of this date.)

17   Q.   Mr. Schlesinger, can you identify this document for me?

18   A.   This document is a printout of Comps Inc. that has been

19   derived from city finance and it depicts the information of the

20   building.

21         THE COURT:  Do you have a copy of this document for

22   me?

23         MR. ROSENBLOOM:  Yes, Your Honor.

24         THE COURT:  Mr. Ravert has one too, I suppose?

25         MR. ROSENBLOOM:  Yes.

1          THE COURT:  Okay.  Thank you.

2    BY MR. ROSENBLOOM:

3    Q.   Is it your testimony that this is information that you had

4    received from Comps, Inc.?

5    A.   Yes.

6          MR. ROSENBLOOM:  I would move this into evidence as

7    Debtor's Exhibit 2, Your Honor.

8          THE COURT:  Any objection?

9          MR. RAVERT:  No, Your Honor.

10          THE COURT:  In the absence of objections it is

11    received in evidence.

12    (Printout from Comps, Inc. was hereby admitted as Debtor's

13    Exhibit 2 for identification, as of this date.)

14    BY MR. ROSENBLOOM:

15    Q.   Mr. Schlesinger, you were here when Mr. Zachary testified,

16    were you not?

17    A.   Yes.

18    Q.   And do you recall Mr. Zachary's testimony with regard to

19    what the expenses were for this building, the percent of the

20    expenses to income?

21    A.   Yes.

22    Q.   All right.  Do you recall what he had testified?

23    A.   That Mr. Zachary utilized a fifty-three percent ratio for

24    expenses.

25    Q.   All right.  Is that fair?

1    A.    Yes.

2    Q.    And looking at the information that you have on Exhibit

3    1 -- I'm sorry, on Exhibit 2 which is for comp number one, does

4    that give you information on the income of this building?

5    A.    Again, can you repeat what's the question?

6    Q.    Yes.

7    A.    Exhibit 1.

8    Q.    Does Exhibit 2, which I gave to you, does that provide you

9    with information concerning the gross income of this building,

10   this comp?

11   A.    Yeah.  That's a printout of City Finance that

12   owners/landlords have to file the RFP for the city for the tax

13   purposes.

14   Q.    Uh-huh.

15   A.    And from that were you able to calculate or estimate a cap

16   rate --

17   A.    Yes, that's correct.

18   Q.    -- for this sale?  Now does Mr. Zachary's report give a

19   cap rate for his comps?

20   A.    No, they don't.

21   Q.    Is that normal?

22   A.    It's not normal, no.  It's unusual.

23   Q.    And did you create a cap rate for this comp?

24   A.    Yes, I did.

25   Q.    Uh-huh.  And would you explain to the Court how you

1    determined what the cap rate on this comp sale was?

2    A.   I took the comparable sales that Mr. Zachary has stated in

3    the report and I looked at the gross income that was reported

4    by the landlords of those buildings and that's how I was able

5    to get the gross income.

6    Q.   And what did you -- how did you determine -- what did you

7    use for expenses?

8    A.   I utilized the same ratio that Mr. Zachary used in his

9    report and I did a fifty percent ratio and that gave me an NOI

10   for each building.

11        So basically I took the gross income of that building,

12   divided that into half -- divided by two, so that gave me -- so

13   that left me with fifty percent of an NOI, a net operating

14   income after expense.

15   Q.   And then what did you do?

16   A.   Then you take that number and you divide that by the sale

17   price of the building and that gives you a cap rate.

18   Q.   Okay.  And what was the cap rate for building comp number

19   1?

20   A.   Comp number 1 at 501 Lefferts Avenue I was able to get a

21   cap rate of 5.8.

22   Q.   Good.

23        MR. RAVERT:  Your Honor, one question.  This is a

24   question for Mr. Rosenbloom.  I heard a reference to the income

25   reflected on the sheet, I don't see it and I'm just -- I don't

1    want to get lost so if you don't mind just point it out to me.

2         MR. ROSENBLOOM:  The second page.

3         (Pause)

4         THE COURT:  Now these -- were these already marked

5    because I'm seeing copies here?

6         (Pause)

7    Q.   Mr. Schlesinger, I'll show you a document that has been

8    marked as Debtor's Exhibit 3.

9    A.   Two.

10        THE CLERK:  Mr. Rosenbloom, stand at the mic, please.

11   Q.   No, no, no.  On the bottom it is marked Debtor's Exhibit

12   3.

13   A.   Exhibit 3, okay.  I see that.

14   Q.   Can you describe for us what this document is?

15   A.   Exhibit 3 is comparable number 2 in Mr. Zachary's report.

16   Location of the building is 531 East 22nd Street.

17   Q.   Now Mr. Zachary talks about that building, I believe, on

18   page 76 of his report?

19   A.   That's correct.

20   Q.   All right.  And I would -- would you please describe what

21   this is?  Did you obtain this through Comps, Inc. as you had

22   obtained the earlier, Exhibit 2?

23   A.   That's correct.

24   Q.   And is this a depiction of what Comps, Inc. shows with

25   respect to the comparable styled as number 2 in the Zachary

1    report?

2    A.    That's correct.

3    Q.    Okay.

4          MR. ROSENBLOOM:  I would move this into evidence,

5    Judge, as Debtor's Exhibit 3.

6          THE COURT:  Any objection?

7          MR. RAVERT:  No, Your Honor.

8          THE COURT:  In the absence of objection, then,

9    Debtor's Exhibit 3 is received in evidence.

10   (Comp 2 in Mr. Zachary's Report was hereby received as Debtor's

11   Exhibit 3 for identification, as of this date.)

12   Q.    All right.  Does Mr. Zachary's report on comparable sale

13   number 2 reflect a cap rate for that sale?

14   A.    No, it doesn't.

15   Q.    And did you calculate a cap rate for this comparable sale?

16   A.    Yes, I did.

17   Q.    And would you, again, explain to the Court exactly the

18   process that you used in determining that cap rate and what the

19   cap rate was?

20   A.    We repeated the same -- the same demonstration as we did

21   with comparable number 1.  We looked up city finance for the

22   gross income.  We divided the gross income into fifty percent

23   expense ratio, as Mr. Zachary uses in his report, that gave us

24   an NOI and we divided that NOI into the sale price and that

25   gave us a cap rate for the property.

1    Q.   Uh-huh.  And what was the cap rate for this second

2    comparable utilized by Mr. Zachary?

3    A.   The cap rate for 531 East 22nd Street, as comparable

4    number 2, was 5.7.

5    Q.   Not 7.5?

6    A.   No.

7    Q.   Mr. Schlesinger, I show you what's been marked as --

8          THE CLERK:  Mr. Rosenbloom, please speak into the mic.

9          MR. ROSENBLOOM:  I'm sorry.

10   Q.   Mr. Schlesinger, I'll show you what has been marked as

11   Debtor's Exhibit 4 and I'll ask you to look at it and identify

12   it for me.

13        (Pause)

14   Q.   Go ahead, Mr. Schlesinger.

15   A.   Debtor's Exhibit 4 is a property located at 1928 Ocean

16   Avenue that's comparable with sale number 3 in Mr. Zachary's

17   report.

18   Q.   And is this also a compilation of information that you

19   pulled off of Comps, Inc.

20   A.   That's correct.

21   Q.   As you had done previously?

22   A.   That's correct.

23        MR. ROSENBLOOM:  I would move into evidence as

24   Debtor's Exhibit 4 the Comps, Inc. analysis of building number

25   -- comp number 3.

1          MR. RAVERT:  No objection, Your Honor.

2          THE COURT:  In the absence of objection, Debtor's 4

3     received in evidence.

4     (Comps, Inc. analysis of Mr. Zachary's Comp 3. was hereby

5     admitted as Debtor's Exhibit 4 for identification, as of this

6     date.)

7     Q.   And with the information that you obtained from Comps,

8     Inc., were you able to create a cap rate for this particular --

9     for the sale of this building as well?

10    A.   That's correct.

11    Q.   And for the purposes of the record, would you please

12    describe the process that you had utilized?

13    A.   We repeated the same exercise as we did on the other

14    comparable sales.  We took the gross income and we divided that

15    by fifty percent.  That gave us a net operating income and that

16    was divided by the sales price and that gave us a cap rate.

17    Q.   Uh-huh.  And what was the cap rate on this building, on

18    this comparable?

19    A.   On the Ocean Avenue the cap rate was 4.52.

20    Q.   Not 7.5?

21    A.   That's correct.

22    Q.   Now Mr. Schlesinger, I'll show you what has been marked as

23    Debtor's Exhibit 5 and again I'll ask you to identify it.

24          THE COURT:  Sorry, what was the cap rate for 1928

25    Ocean?

1      THE WITNESS:  4.52.

2      (Pause)

3    Q.   All right.  Would you please identify what Debtor's

4    Exhibit 5 is?

5    A.   Debtor's Exhibit 5 is a property located at 1600 Caton

6    Avenue in the Flatbush section of Brooklyn.

7    Q.   Is this a Comps, Inc. analysis of that particular

8    property?

9    A.   Yes, it's a Comps, Inc. analysis of the property of comp 4

10   that Mr. Zachary used in his report.

11         MR. ROSENBLOOM:  I would move into evidence as

12   Debtor's Exhibit 5 the Comps, Inc. analysis for this particular

13   property.

14         THE COURT:  Any objection?

15         MR. RAVERT:  No objection, Your Honor.

16         THE COURT:  In the absence of objection it's admitted

17   into evidence.

18   (Comps, Inc. Analysis used in Mr. Zachary's Comp 4 was hereby

19   admitted as Debtor's Exhibit 5 for identification, as of this

20   date.)

21   Q.   Okay.  Mr. Schlesinger, after generating this report did

22   you use this report to prepare a cap rate for this particular

23   building?

24   A.   That's correct.

25   Q.   And did you use the same process that you had used on the

1  earlier buildings to determine the cap rate here?

2  A.   Yes, that's correct.  We repeated the same exercise and we

3  derived the cap rate.

4  Q.   Uh-huh.  And what was the cap rate on this?

5  A.   The cap rate for 1600 Caton Avenue was 6.86, 6.86.

6  Q.   Okay.  Now, after analyzing and preparing and determining

7  the cap rates on the comparable sales identified in Mr.

8  Zachary's report, did you do anything further with that

9  information to assist you in determining what the value of the

10  subject building would be?

11  A.   Yes, we did.  We analyzed and concluded a cap rate based

12  on the comparable sales that Mr. Zachary showed in his report

13  and we averaged those four cap rates and the conclusion was a

14  cap rate of 5.72.

15  Q.   That would be based upon the comparables that were used by

16  Mr. Zachary in his report?

17  A.   That's correct.  Those are comparables that Mr. Zachary

18  himself has utilized.

19  Q.   And based upon that information have you done an analysis

20  as to what the value of this building would be, based upon the

21  average cap rate of the comparables?

22  A.   Yes, I did.  I took the average cap rate of 5.72 and I

23  took the NOI of the subject that Mr. Zachary reported as

24  339,359 and we divided that for a total value of 5,932,850

25  dollars, close to six million.

1    Q.    Now --

2            THE COURT:  Give me the number again, if you would

3    sir.

4            THE WITNESS:  The indicated value, based on the cap

5    rate of 5.72 that was the average of Mr. Zachary's sales,

6    comparable sales, the total number is 5,932,850 dollars.

7    Q.    Now, let's turn -- let's stay with Mr. Zachary's

8    comparable sales and, if we could, Mr. Zachary also did, in his

9    analysis of the income, he had taken an adjustment of the sale

10   price of twenty percent on all of his comps.  I think the first

11   comp, if we could turn to page 75, to adjust the unit prices.

12   Is that a typical -- a normal activity in preparing appraisals?

13   A.    The red flag that we also came across was that he did

14   across-the-board, a flat-out across-the-board minus adjustment

15   on condition.  That's not typical.  Across-the-board condition

16   for every comp, that's not typical.

17   Q.    And --

18   A.    For the same amount.

19   Q.    Can I ask you, what was the affect of that twenty percent

20   across-the-board deduction on value?

21   A.    It diminishes the value of the subject by twenty percent,

22   that's a lot of money.

23   Q.    And if in fact that twenty percent was imputed back into

24   the calculation, what would the value be?

25   A.    If the twenty percent -- if you take out the twenty

1    percent the value of the property would be twenty percent

2    higher.

3    Q.   And what affect would that have?  That would be on all the

4    comps as well?

5    A.   If you take the twenty percent out of Mr. Zachary's

6    report, you have a unit value of 6,012,891.  That's 6,012,891

7    dollars.  Mr. Zachary has a value of 4.8 million, that's after

8    he takes out the twenty percent.  If you add back that twenty

9    percent across-the-board adjustments, you're back up to over

10   six million dollars.

11            THE COURT:  Okay.  Walk me through this, if you would.

12   If you add back the twenty percent to the valuation that Mr.

13   Zachary arrived at for the subject property?

14            THE WITNESS:  Again, Your Honor, I didn't -- what is

15   the first part of the question?

16            THE COURT:  I just said, if you could walk me through

17   this calculation, please?

18            THE WITNESS:  Okay.  Mr. Zachary, in his report and

19   that's on page 72 -- page 72.

20            THE COURT:  Okay.  I'm looking at page 72.

21            THE WITNESS:  Okay.  In the middle of the page he has

22   condition and he takes twenty percent minus across-the-board

23   adjustment for all comps for the units.  That talks about the

24   units.

25            THE COURT:  That's the unit price, okay.

1          THE WITNESS:  Unit price.  So after you take the

2   adjustments he has on the bottom sale 161, sale 268, sale 397,

3   sale 493 and he has an adjusted mean for 80,000 dollars.

4          If you take out -- that gives him a total of 4.8

5   million.  If you put the twenty percent back, so that's 4.8

6   million plus twenty percent.  That will give you a total price

7   of 6,012,891 dollars or 100,000 dollars per unit, instead of

8   eighty.

9          THE COURT:  Okay.  Thank you.  I'm sorry; give me the

10  number again.

11         THE WITNESS:  The total number would be 6,012,891.

12  BY MR. ROSENBLOOM:

13  Q.   Now with respect to the subject property, did you do an

14  analysis to determine the size of the units and the comps as

15  compared to the size of the unit in the subject property?

16  A.   Yes, I did.

17  Q.   And would you explain to the Court what process you used

18  in doing that?

19  A.   We look -- we took the subject property and we look up --

20  we reported the size of the property.  We looked up the size of

21  the property and that's -- as Mr. Zachary has in his report.

22  And the size of the property is 70,998 square feet, that's

23  70,998 square feet for the total gross building area, the

24  footage.

25  Q.   And then what did you do?

1  A.   Then we divided that by the units that the building has

2  and the building has sixty units.  So we divided 70,998 into

3  sixty and that gave us a final unit size of 1,183 on average.

4  Q.   Uh-huh.  And did you use that same exercise in looking at

5  the comps that were reported in Mr. Zachary's report?

6  A.   Yes, we did.

7  Q.   And with respect to what the comp number 1, what was the

8  average size of that unit -- of the units in that building?

9  A.   Comp number 1 of Mr. Zachary's report, that's on 501

10 Lefferts Avenue, the average size is 896 square feet per unit.

11 Q.   And did you use that same analysis with respect to comp

12 number 2?

13 A.   Yes, we repeated our exercise and the comparable located

14 at 531 East 22nd Street gave us an average unit size of 1,026.

15 Q.   And with respect to comp number 3?

16 A.   Comp number 3, 1928 Ocean Avenue in Brooklyn, we repeated

17 that same exercises and the average unit size was 961 square

18 feet per unit.

19 Q.   And again, the average size in the Martense property is?

20 A.   The average size is eleven -- is 1,183, that's 1,183

21 square feet.  I would say it's approximately twenty percent

22 larger than comp number 1, 2 and 3.  Actually comp number 1

23 it's more than twenty percent but I would say it's approximate

24 twenty percent larger than comp number 1, comp number 2 and

25 comp number 3.

1   Q.   Now generally in determining value of units, does the size

2   of a particular unit affect value?

3   A.   Yes, of course.

4   Q.   And how does it affect value?  I know it's apparent but

5   for the record could you please?

6   A.   The word value is a general term.  Value means it's a

7   total of what you have.  If you have a bigger unit you have,

8   usually, more bedrooms.  More bedrooms extracts a higher rent

9   value.  It has more space.  The bigger the property the more

10  value you have.

11  Q.   Now this building, the Martense property, you indicated

12  that there are terraces or patios, as you've described them, on

13  that property?

14  A.   That's correct.

15  Q.   Does that enhance value of a property?

16  A.   Of course.  Yes, it does.

17  Q.   And in looking at the comps that are reflected in Mr.

18  Zachary's report, other than comp number 4 do any of those

19  properties have terraces?

20  A.   No, they don't.

21       (Pause)

22  Q.   Now, in reviewing the subject property and reviewing Mr.

23  Zachary's report, did you do any analysis of value based upon

24  square footage of the building?

25  A.   Yes, I did.

1  Q.   Would you explain exactly what process you used in that

2  exercise?

3  A.   We look at the building, at the subject building, at the

4  gross building area.  Then we compare that.  Then we look at

5  the GBA, the gross building area, of the comparable sales and

6  we divide the gross building areas of those comps into the sale

7  price and that gives us a square feet price of each sale.

8  Q.   Uh-huh.  And if we could, did you do that analysis with

9  respect to comp number 1?

10  A.   Yes.

11  Q.   Would you explain to the Court exactly what you had done

12  with respect to comp number 1?

13  A.   Comp number 1, located at 501 Lefferts Avenue, has a gross

14  building area of 53,784 and the building sold for 4.6 million.

15  So I divided the 53,784 into 4.6 million and that gave me a

16  gross square feet price of $85.53.

17  Q.   And did you use that same exercise with respect to comp

18  number 2?

19  A.   Yes, we did.  Comp number 2 at 531 East 22nd Street has a

20  total size of gross building area that amounts to 35,922 and we

21  divided that into the sale prices of 2,992,200.  So that gave

22  us a square feet price of $83.30.

23  Q.   And with respect to comp number 3?

24  A.   We repeated the same thing for comp number 3 at 1928 Ocean

25  Avenue.  That has a gross building area of 52,830 square feet.

1   We divided that into the sale price that 1928 Ocean Avenue sold

2   for, that was 6,700,000 and that gave us a square feet price of

3   126,000.82.

4   Q.   And then with respect to comp number 4?

5   A.   Comp number 4 at 1600 Caton Avenue --

6        THE COURT:  I apologize for interrupting you.  Can you

7   repeat the square foot price for comp number 3?

8        THE WITNESS:  Comp number 3 square feet price was

9   $126.82.

10       THE COURT:  Thank you.  Go ahead.

11  Q.   Let's proceed.

12  A.   Comp number 4, address at 1600 Caton Avenue, has a gross

13  building area of 102,198 square feet.  It got sold for nine

14  million dollars.  So I divided the gross building area into the

15  nine million and that gave me a price per square feet for

16  $88.06 -- 88.06.

17  Q.   And then what did you do?

18  A.   Then I took all four prices and I averaged and it gave me

19  a $95.93 average from the four comparable sales and I

20  timesed (ph.) -- I did $95.93 times the subject at Martense

21  Street that has 70,998 square feet and that gave me the value

22  of 6,810,672.

23       THE COURT:  I'm going to ask you to repeat that number

24  again.

25       THE WITNESS:  6,810,672.

1        THE COURT:  Thank you.

2        (Pause)

3    Q.   Now Mr. Schlesinger, you've testified that you were in the

4    building and you saw the general condition of the building.

5    Did you also have the opportunity to examine the city website

6    concerning violations on the property?

7    A.   Yes, I did.

8    Q.   I'll show you a document which we'll mark as Debtor's

9    Exhibit 6.

10   (New York City Department of Buildings Property Profile

11   Overview was hereby marked as Debtor's Exhibit 6 for

12   identification, as of this date.)

13       (Pause)

14   Q.   I would ask you if you can identify this document.

15       THE COURT:  Do you have a copy for me, Mr. Rosenbloom?

16   Do you have a copy for me?

17       MR. ROSENBLOOM:  Yes.

18       THE COURT:  Thank you.

19   Q.   Mr. Schlesinger, could you identify this document for me?

20   A.   This document is a New York City Department of Buildings

21   Property Profile Overview.

22   Q.   And how did you obtain that?

23   A.   I went to -- I logged into the Department of Buildings'

24   site.

25   Q.   And this is what was printed out?

1    A.    That's correct.

2          MR. ROSENBLOOM:  Your Honor, I would offer this into

3    evidence as Debtor's Exhibit 6.

4          THE COURT:  Any objection?

5          MR. RAVERT:  I just have one question, what's the

6    date?  I can't tell, is there a date on it?

7          MR. ROSENBLOOM:  Sure.  I think on the bottom it tells

8    you January 6.

9          MR. RAVERT:  1-6, okay.  No, no objection, Your Honor.

10         THE COURT:  Without objection then, Debtor's 6 is

11   received in evidence.

12   (New York City Department of Buildings Property Profile

13   Overview was hereby admitted as Debtor's Exhibit 6 for

14   identification, as of this date.)

15   BY MR. ROSENBLOOM:

16   Q.    Mr. Schlesinger, when did you perform this search, if I

17   may?

18   A.    This morning, on the 6th.

19   Q.    Okay.  And what does this report show, insofar as

20   violations on the property?

21   A.    We usually go into the site and this gives us an idea

22   about buildings.  If you see a lot of complaints, if you see a

23   lot of violations that tells us -- that tips us off something

24   is missing in the building or there is something happening in

25   the building.

1  Q.    So does this report tell you anything about those matters

2  with respect to this building?

3  A.    Yes, it does.

4  Q.    Would you please explain?

5  A.    If -- the first thing we look is for complaints.  Usually

6  if you have a complaint the city sends out an inspector and he

7  gets a violation and the landlord has to rectify that violation

8  or the management has to rectify that violation.

9        If you see a lot of open complaints, meaning that it was

10 not rectified, it means the building is not being taken care.

11 It's an indicator; it's a bad indicator about the buildings.

12       In this case the open complaints are zero.  If you look in

13 the middle you'll see it says zero.

14 Q.    Now, it reflects that there are eight Department of

15 Building violations, is that correct?

16 A.    Yeah.  The next -- yes.  The next line has the violations,

17 Department of Building has eight.

18 Q.    And is that unusual in a building of this type?

19 A.    It's -- eight is on the low side.  Usually a building of

20 this type usually has more than that.

21 Q.    And I see that there are 22 ECV violations.

22 A.    That's the -- line 3 in the middle of the page.  That's

23 the environmental agency; they have, like, twenty-two

24 complaints open on this building.

25 Q.    Uh-huh.  And what do those complaints generally consist

1   of?  What type?

2   A.   It could be from paint peeling in the hallways, most of

3   the time it's not major.  It can be anything that the inspector

4   who walks through the building sees.  If a light bulb is not

5   working, that could be a violation.  Sometimes it's an elevator

6   inspection that permits weren't filed, that they weren't filed

7   on time, that's also a violation.

8   Q.   Did you see anything in your inspection of this building

9   that alerted you to anything extraordinary?

10  A.   No, I did not.

11  Q.   All right.  Mr. Schlesinger, having reviewed Mr. Zachary's

12  appraisal of this building have you determined or reached a

13  conclusion as to what the value of this building is?

14  A.   The conclusion that I derived, based on the information

15  extracted from Mr. Zachary's report, I didn't add anything I

16  just used -- I just utilized and reviewed the information that

17  Mr. Zachary has used, the indicators they all pointed to a

18  higher number.  Most of the numbers pointed between six and

19  seven million dollars.

20          MR. ROSENBLOOM:  No further questions, Your Honor.

21          THE COURT:  Cross examination?

22          MR. RAVERT:  Should I go right into it, Your Honor?

23  No break?

24          THE COURT:  Do you want a break?

25          MR. RAVERT:  No, no.  I don't need a break.

1        THE COURT:  Okay.  Then start right in.

2   CROSS EXAMINATION

3   BY MR. RAVERT:

4   Q.   Good afternoon, Mr. Schlesinger.

5   A.   (No audible response).

6   Q.   I've got a number of areas I'd like to cover; I'll start

7   with the Debtor's Exhibits 2, 3, 4 and 5.  You recall those are

8   the Comp, Inc. reports?

9   A.   Okay.

10  Q.   On page 2 I see --

11  A.   Which exhibit?

12  Q.   I'm sorry; I'm starting with Debtor's Exhibit 2, I

13  apologize.

14  A.   Exhibit 2?

15  Q.   It's called Debtor's Exhibit 2.  It's the Comps, Inc.

16  report that has a one in the upper right-hand corner and should

17  say DE -- it should say Exhibit 2 on the bottom.  It's the one

18  for 501 Lefferts.

19  A.   Okay.  Go ahead.

20  Q.   I direct your attention to the second page, below where it

21  says factors used by finance to determine market value.

22  A.   Okay.

23  Q.   You didn't have an actual income to work from, you had to

24  estimate it, is that correct?

25  A.   I didn't have an actual owner's income.  That's very

1    unusual. Landlords don't usually disclose earnings of

2    buildings unless I appraised the property and I had obtained

3    that information from the client or it somehow became public

4    information we get that -- we have that information.

5       If lacking all those -- lacking these things the only way

6    for us to get information is to go on the Department of Finance

7    and look up what the landlords reported.

8    Q.   In trying to determine the cap rate for each of those

9    individual properties, you used an expense percentage of fifty

10    percent, is that right?

11    A.   That's correct.

12    Q.   And that's a little bit less than the expense percentage

13    that Mr. Zachary used for the subject building, which was

14    fifty-three percent?

15    A.   That's correct.

16    Q.   And how does it affect value if you use an expense

17    percentage that's a lower percentage rather than a higher

18    percentage? Would that result in a higher value or a lower

19    value?

20    A.   Yeah. I mean, it results in a little bit of a higher

21    value. I just streamlined it. The three percent usually is

22    not going to make that much of a total difference. I just made

23    life easy. I made it, instead of fifty-three, I said fifty.

24    Q.   That's right. I'm just trying to understand it.

25    A.   Yeah.

1  Q.   What is a typical range of cap rates for apartment

2  buildings in Brooklyn?  Is there one that you could tell the

3  Court?

4  A.   The typical range of apartment buildings today in Brooklyn

5  is, let's say, between four and six.

6  Q.   Between four and six in Brooklyn?

7  A.   Yeah.

8  Q.   So it's a fairly narrow range?

9  A.   That's correct.

10  Q.   And what sort of factors would go into determining whether

11  to use a lower cap rate or a higher cap rate, recognizing that

12  a lower cap rate results --

13  A.   In higher value.

14  Q.   -- right, in a higher value and a higher cap rate would

15  result in a lower value for a building?

16  A.   It has to do with the amenities of the building.  It has

17  to do with the condition of the building and, of course, the

18  bottom line is the location of the building.  Its location,

19  location, location as we say in real estate.

20  Q.   Thank you.  And appraisers are guided by USPAP, right?

21  A.   That's correct.

22  Q.   That's the standard.  What does USPAP stand for again,

23  could you just remind me?

24  A.   It's the Uniform -- it's the standard appraisal -- it's by

25  the Appraisal Institute.  It's, like, the bible that appraisers

1  have to abide by.

2  Q.   Okay.  Under USPAP are review appraisals permitted?

3  A.   Of course.  What's the question again?

4  Q.   I said, under USPAP are review appraisals permitted?

5  A.   In regards to what?  What's the question?

6  Q.   Well, can a review appraiser submit a review appraisal

7  under USPAP guidelines?  Does USPAP provide for a review

8  appraisal?

9  A.   In the context of a litigation, USPAP does -- I'll take

10  that back.  I'm not clear with your question.  I'm not clear

11  with your question.  Can you just explain yourself a little

12  better?

13  Q.   Do the USPAP guidelines provide for the use of review

14  appraisals?  In other words, can there be a review appraisal

15  that is submitted in accordance with USPAP guidelines?

16  A.   Of course.  Yes.

17  Q.   Okay.  Of the four comparable sales that are reflected in

18  Debtor's Exhibit 2, 3, 4 and 5, right, that's Lefferts, 22nd

19  Street, Ocean Avenue and Caton Avenue, did any of those

20  properties involve a bulk lease like the one it used with

21  Baron's rentals?

22  A.   I am not aware -- I didn't check on those things.  I'm not

23  aware of that.

24  Q.   You testified previously that only one of the properties

25  involved a terrace, is that right?

1  A.   Yes.

2  Q.   And you know that how?

3  A.   By looking at the picture.  You could see it on the

4  picture.

5  Q.   But the pictures, to be clear, are just front shots?

6  A.   Yes.

7  Q.   And in fact some of the terraces on Martense are in the

8  rear, are they not?

9  A.   In the rear, yeah.  Not every unit in Martense has a patio

10  but, yeah, large majority do have.

11  Q.   With respect to Debtor's Exhibit 6, that's the DOB

12  printout from this morning.

13  A.   Okay.

14  Q.   Could you tell me how many of those complaints, violations

15  and the ECV violations, separately if you would, were existing

16  as of the date of the Leitner appraisal, which I will state for

17  the record was October 14th, 2010?

18  A.   I would not know that.  I didn't compare.

19  Q.   Okay.  Of the -- it appears to me, looking at this, that

20  those are hyperlinks where it says "Complaints, Violations and

21  ECV Violations," is that accurate?

22  A.   Yes.

23  Q.   Did you follow those links to see the nature of the

24  violations?

25  A.   Not really.  No.

1      (Pause)

2   Q.   The Court doesn't have a copy of this but I would ask you

3   to turn to the third page of the notes, I'll call them, that

4   Mr. Rosenbloom handed you.  It's written on top "Review of Mr.

5   Peter L. Zachary's Appraisal Report".  That's correct, that

6   document.

7   A.   Okay.

8   Q.   I see -- on the last page I see average unit size 896,

9   1,026, 961 and 1,327.  Could you average those for me?

10  A.   The average of those four unit -- units are -- again, I

11  should average the four comparable sales?

12  Q.   What I'm asking you to do is average the average unit

13  size.

14  A.   Okay.

15  Q.   And I'm asking you to average between the four comps.  Do

16  you have a calculator on you?

17  A.   Yeah.

18       (Pause)

19  A.   1,052.

20  Q.   1,052, okay.  And the average unit size of the subject

21  property is, according to this?

22  A.   1,183, that's 1,183 square feet.

23  Q.   Okay.  Thank you.  When you were speaking before, when you

24  testified earlier, you said -- you noted that the difference in

25  the average unit size between the subject and comparable 1 was

1  well more than twenty percent and so on, and you went through

2  each one of them.  But on average these comparables are far

3  less than twenty percent, I don't have a calculator to tell you

4  the percent difference but it's the difference between 1,050

5  and -- what number did you just give me?

6  A.   1,052.

7  Q.   1,052 and 1,183.

8  A.   It's the last comp, Caton Avenue, that --

9  Q.   Excuse me.

10  A.   -- that brings up the --

11  Q.   I see.  Thank you.  Okay.  As a review appraiser is it

12  your practice to speak with people in the field regarding

13  market perceptions and property?

14  A.   Yes.  We speak a lot with professionals.  I'm in touch, on

15  a daily basis, with CBL lists, banks, professionals in the real

16  estate field, yes.

17  Q.   Okay.  Thank you.  What is the market perception of a

18  building that houses emergency housing tenants, to the best of

19  your knowledge?

20  A.   The perception, to start with, usually means there's a

21  landlord who wants to make money.

22  Q.   Okay.  Is it considered more or less desirable for a

23  market or a rent-stabilized tenant to live in a building where

24  there are emergency housing tenants living?

25  A.   You have to put it into context.  I mean, you're not going

1    to take a Fifth Avenue building and put in an emergency housing

2    or a welfare type of client.  You're talking about a general

3    residential building located in Brooklyn where a big percentage

4    of the private houses that have rentals are rented out for

5    Section 8.  So therefore, if you have an apartment building and

6    you have emergency placements by the city of Section 8s, that

7    does not make the building less desirable.  No.

8    Q.    You said a big percentage, what did you mean exactly by a

9    big percentage?  This building is in Midwood, is that correct?

10   A.    Yes.

11   Q.    So what did you mean by a big percentage?

12   A.    A lot of tenants in the central Brooklyn area are Section

13   8 tenants.  Section 8 has a couple hundred thousand tenants in

14   New York City and those tenants are usually in these

15   neighborhoods.  They're not on Fifth Avenue.  They're not on

16   the Upper West Side or Upper East Side.  These are blue collar

17   type of neighborhoods.

18        So it's not like because this apartment house has a

19   Section 8 tenant it makes it less desirable.  I mean, you have

20   a lot of -- you have thousands of Section 8 units surrounding

21   this property.

22   Q.    I don't want to be miscommunicating with you.  You're

23   referencing Section 8 --

24   A.    That's correct.

25   Q.    -- and I've been asking you about emergency housing

1    program.  Are you saying that they're the same?

2    A.    No, it's not but these units are mostly Section 8s.

3    Q.    These units, what are you referring to?

4    A.    In the subject, for Martense, 61 Martense.  Is that -- I

5    want to be clear about something; you said emergency placements

6    in the subject property at Martense?

7    Q.    Yes, that's the one I'm referring to.

8    A.    Oh.  My understanding is that those are emergency Section

9    8 placement tenants.

10   Q.    Emergency housing under the Section 8 program, is that

11   what you're saying?

12   A.    Under the Section 8 program, that's correct.

13   Q.    How did you come to that information?

14   A.    I spoke to the owner.  I looked up under the Baron's

15   advertisement that they have on the subject property and they

16   advertise this as Section 8.

17   Q.    Uh-huh.  And who encompasses, typically, these emergency

18   housing tenants?

19   A.    Anyone that has Section 8 that could mean any person that

20   has a big family and is below a certain threshold that

21   qualifies for a Section 8 subsidy and a fire happens, they have

22   to leave the current unit that they have so the city has these

23   agencies that place these people someplace.

24   Q.    Is it fair to say that emergency housing tenants -- the

25   apartments of emergency housing tenants tend to have higher

1  maintenance and higher -- higher maintenance and higher

2  repairs?

3  A.   No.

4  Q.   So it's not your opinion that the presence of the Baron's

5  lease in this building depresses the value at all, is that

6  correct?

7  A.   That's correct.

8  Q.   Okay.  I'd like to talk about -- you have had a chance to

9  look at the Leitner appraisal, is that correct?

10 A.   That's correct.

11 Q.   And did he take into account a vacancy rate?

12 A.   I --

13       MR. ROSENBLOOM:  Your Honor, I'm going to object to

14 asking questions about the Leitner appraisal which is not in

15 evidence.  As a matter of fact, counsel fought vehemently hard

16 to keep it outside of evidence and I don't think it's

17 appropriate that we should be examining into it for any reason.

18       THE COURT:  Do you really want to open the door to

19 that?

20       MR. RAVERT:  I have to admit, I'm confused even by the

21 objection because Mr. Schlesinger is here to testify about his

22 review of the Leitner appraisal.

23       THE COURT:  The Leitner -- no, he's testifying about

24 his review of Mr. Zachary's appraisal.

25       MR. ROSENBLOOM:  Absolutely.

1          MR. RAVERT:  He's not testifying about the Leitner

2     appraisal?

3          MR. ROSENBLOOM:  Not at all.

4          THE COURT:  Well this whole line of testimony related

5     to Mr. Zachary's appraisal, correct?

6          MR. RAVERT:  In general this relates to the property.

7          THE COURT:  I beg your pardon?

8          MR. RAVERT:  In general this all relates to the

9     property, Your Honor, so yes.

10         THE COURT:  I do not recall hearing any testimony

11    about the Leitner appraisal and you objected to that, did you

12    not?

13         MR. RAVERT:  I did.  I wasn't sure -- and now in

14    hindsight I'm not sure how that was resolved.  But I do see

15    that it's marked as Exhibit 2.  So I'm satisfied if it's not in

16    evidence.

17         MR. ROSENBLOOM:  It's not in evidence.

18         THE COURT:  If somebody, and I guess I have to take my

19    share of the blame here and seen fit to order the first

20    transcript, although I would think that if you wanted me to

21    read the transcript of the first hearing you would have ordered

22    it.  But if somebody had ordered it we would be clear on this

23    point, wouldn't we.

24         But in any event, my recollection is that it was not

25    admitted in evidence.

1          THE WITNESS:  It was not admitted into evidence, Your

2    Honor.

3          MR. RAVERT:  Thank you.  I'm sorry but I was confused

4    because it's marked.  Very well.

5          THE COURT:  I think he marked it but we didn't admit

6    it.

7          MR. RAVERT:  Fair enough.

8    BY MR. RAVERT:

9    Q.   Mr. Schlesinger, what is an appropriate vacancy rate for a

10   building of this type?

11   A.   From my experience buildings that are located in the

12   subject area have a very low vacancy rate.  They're mostly a

13   hundred percent occupied.  If you get an apartment that gets on

14   the market it turns over very fast.

15   Q.   Could you give me a number?  I'm not sure what you mean by

16   low.  I don't know if low is twenty percent or --

17   A.   Mr. Zachary's report states that the building is a hundred

18   percent occupied.  I mean, for purposes when we do an operating

19   statement we put in a vacancy rate just for including some kind

20   of loss of a friend but they're usually around, let's say,

21   three percent maximum.

22   Q.   Three percent maximum.

23   A.   Maximum.  But it would be lower in this building but I

24   would say three percent is the maximum.

25   Q.   Does three percent apply to all of the rentable spaces in

1   the building?  In other words, would that three percent apply

2   equally to the garage space?

3   A.   They usually go together, yeah.

4   Q.   And market rents?  Market rentable apartments as opposed

5   to rent stabilized rentable apartments?

6   A.   Yes.

7   Q.   In other words there's no -- you don't differentiate

8   between the type of unit; you just use one single number?  I

9   don't want to put words in your mouth, I'm asking a question.

10  A.   Yeah, they usually go together.  Yeah, we usually do not

11  separate.

12  Q.   You testified that the condition of the building is -- let

13  me get this correct, what you testified to was that it was fair

14  to average.

15  A.   Average to good.

16  Q.   Right.  And then after that you said "Average" and he

17  said -- and Mr. Rosenbloom said "What do you mean by average?"

18  and you said "Average means average to good," which is what

19  you're saying now, is that correct?

20  A.   That's correct.

21  Q.   When asked what does it mean average to good, you ran down

22  a short list of things, among one of them was a building that

23  was up kept.

24  A.   That's correct.

25  Q.   Okay.  How do you reconcile saying that the building was

1    up kept when you saw on the DOB website that there were

2    numerous violations?

3    A.    The website violations are not out of the ordinary.  You

4    will never find a building this size that has no violations.  I

5    have not seen that.

6         The amount of violations for this type of a building is on

7    the low side.  You've got eight violations for the Department

8    of Buildings and twenty-two for the environ -- I mean, this is

9    really on the low side for this size of a building.

10   Q.    Okay.  But again, that was true as of the date you checked

11   it, which was today.

12   A.    As of today, that's -- yeah.

13   Q.    And you don't know what it was as of the date that these

14   appraisals were conducted?

15   A.    That's correct.

16   Q.    I'd like to draw your attention to these pictures for a

17   minute, if you don't mind.  Could you turn to page 5 first?

18   A.    Okay.

19   Q.    I'm looking at picture on the upper left-hand corner, the

20   lower left-hand corner and the lower center.

21   A.    Okay.  Upper left.

22   Q.    Upper left, lower left and center bottom.

23   A.    Okay.

24   Q.    Was that a vacant apartment?

25   A.    As I stated before, I was just randomly knocking on doors

1    and this was a -- this was an apartment that they did some

2    work -- they were actually -- in the picture you could see the

3    shellac is shining back, they just finished shellacking.  That

4    is a vacant unit.  Yeah, it was about to be rented, I was told.

5    Q.   So as of the time you were there, that apartment was not

6    rented?  Someone -- was it a workman that answered the door?

7    A.   Yes.  It has been rented but they were about to move in.

8    I mean, I wouldn't know --

9    Q.   I'm sorry; I didn't hear what you said.

10   A.   It could have -- it's very possible it got rented and they

11   had to prepare it, that it was rented.

12   Q.   Similarly, on page 6 on the right-hand side, the upper

13   right and the middle right --

14   A.   Okay.

15   Q.   -- are those pictures from a vacant apartment?

16   A.   Yes, that's a part of this unit.

17   Q.   On the --

18   A.   Let me just make a note for Your Honor.  I did randomly

19   knock on doors and usually when that's the case I go in and out

20   fast.  I wasn't able to mark and that's why I don't have

21   numbers.

22         THE COURT:  Okay.

23         THE WITNESS:  I was happy I was able to get in.

24   Q.   Thank you.

25   A.   I apologize for that.

1   Q.   On page 1 on the right-hand side there's a picture of the

2   garage entrance?

3   A.   Okay.  That's correct.

4   Q.   Do you see there's a sign there that says garage parking

5   with a phone number on it?  Actually, the right-hand side

6   middle and on the bottom right, both of them say garage

7   parking?

8   A.   Yes.

9   Q.   So it's possible that there were vacancies in the garage

10  if they're advertising?

11  A.   I wouldn't have an answer to that.

12  Q.   You wouldn't know that.  Okay.  You're not suggesting --

13  you had testified that it's not usual to do an external only

14  appraisal of a building, inspection of a building?

15  A.   That's correct.

16  Q.   But that doesn't make it invalid, does it?

17  A.   It makes it suspect.  It's New York City, it's not far,

18  you can always go down, you could go in.  And if you don't do

19  that, that raises a red flag, why was the appraiser hesitant to

20  go in or why didn't he try to go in when it's not such a --

21  it's not so unconvenient (sic) to go in.

22       (Pause)

23       MR. RAVERT:  I have no further questions, Your Honor.

24       THE COURT:  Anything Mr. Rosenbloom?

25       MR. ROSENBLOOM:  No, Your Honor.

1          THE COURT:  You may -- you are excused.  You may step

2     down.

3          MR. RAVERT:  Your Honor, I do intend to call Mr.

4     Zachary on rebuttal, I would just ask Mr. Schlesinger to please

5     leave those exhibits up there.

6          THE COURT:  Okay.  Do you have any other witnesses

7     that you intend to call?

8          MR. ROSENBLOOM:  No, Your Honor.

9          THE COURT:  So you may proceed with your rebuttal

10     testimony.

11          MR. RAVERT:  Your Honor, could I have a five minute

12     break --

13          THE COURT:  Yes.

14          MR. RAVERT:  -- please?

15          THE CLERK:  All rise.

16          (Recess from 3:19 p.m. until 3:47 p.m.)

17          THE COURT:  Be seated, please.  Okay.  Call your

18     witness, Mr. Ravert.

19          MR. RAVERT:  I call Mr. Zachary to the stand.

20          (Witness duly sworn)

21          THE CLERK:  Please speak and spell your name for the

22     record and be seated.

23          THE WITNESS:  Peter Zachary, Z-A-C-H-A-R-Y.

24     DIRECT EXAMINATION

25     BY MR. RAVERT:

1  Q.  Good afternoon, Mr. Zachary.

2  A.  (No response).

3  Q.  Mr. Schlesinger testified that in his opinion the building

4  was in average condition --

5      THE COURT:  I'm going to ask you to keep your voice up

6  because I'm having a little trouble hearing you.

7      MR. RAVERT:  Okay.  I apologize, Your Honor.

8  Q.  Mr. Schlesinger testified that the -- that in his opinion

9  the building was in average condition.  You were unable to get

10  into the building -- I'm sorry.  Your appraisal was not based

11  on an internal inspection of the building, is that right?

12  A.  Correct.  Yes.

13  Q.  How would your valuation be changed if you accepted Mr.

14  Schlesinger's condition of the building?

15  A.  Well, my valuation would be slightly different because the

16  cap rate that I used took into consideration the fact that the

17  building was in poor condition and required emergency housing

18  repairs.

19      So my cap rate would have been a little lower, resulting

20  in a little higher value, if I had inspected the building and

21  concluded that the property was in average condition.

22  Q.  And was the Baron's lease factored into your 7.5 percent

23  cap rate?

24  A.  Well, the Baron's lease was factored into the 7.5 percent

25  cap rate but not the emergency tenant housing that we now find

1    out that the Baron's lease really is.  I mean, it's been in the

2    newspapers, you know, emergency tenant housing.  It's not the

3    kid of neighbors people want to have.  It also results in

4    higher repairs and maintenance when you have different people

5    living in the apartment over a period of months, requiring the

6    landlord to repair the kitchen cabinets, to regrout the

7    bathroom, for instance, to repaint the apartment.

8    Q.   Mr. Schlesinger testified that in his belief emergency

9    housing tenants, those apartments do not result in higher

10   maintenance or repairs.  So am I correct that you disagree with

11   that remark?

12   A.   Yes.  Yes, I disagree.  You know, Section 8 is a program

13   that the city has where they basically pay the rent of people

14   who can't afford it.  You know, they say to a tenant you have

15   to pay twenty-five percent of your income toward rent and if

16   twenty-five percent of your income is 500 dollars a month and

17   your rent is 1,200 dollars a month, the city will pay the

18   additional 700 dollars a month.  That's how Section 8 works and

19   there are many people who are on Section 8 and it doesn't mean

20   Section 8 people are bad people or have any negative

21   characteristics about them.

22        But emergency housing repair people are emergency housing

23   repair people and it's not necessarily people who have been

24   displaced from their house because of a fire.  It's people who

25   are homeless, who don't have any place to live.  And the city,

1   instead of the city paying rent to a hotel for someone, what

2   they do is rent an apartment or bulk apartments like this.

3   It's much cheaper for them to do it that way.

4   Q.   Do you recall that Mr. Schlesinger testified that

5   buildings like this typically have approximately a hundred

6   percent occupancy rate?  I'm not asking your opinion.  I'm

7   asking if you recall the testimony.

8   A.   I recall, yes.

9   Q.   If you don't that's fine.

10  A.   Yeah, I recall.  But a vacancy rate isn't a vacancy rate

11  for one year.  A vacancy rate is a vacancy rate over a ten year

12  projection.

13  Q.   When I asked Mr. Schlesinger what might be a fair vacancy

14  rate he testified three percent.  What's your view on that?

15  A.   It can be anywhere between three, five, six, seven, it all

16  depends upon the rent level of the units.  You know, the lower

17  the rent more guaranteed the tenant is to stay in the apartment

18  at a cheap rent.  Market rent tenants can come and go.

19        So we -- as appraisers we generally use a higher vacancy

20  factor for market rent tenants.

21  Q.   And what about for garage space?

22  A.   Garage space is a little problematic because the people

23  who live in that neighborhood have to be able to afford a

24  garage unit.  And if, as Mr. Schlesinger said, so many people

25  in this neighborhood are Section 8 people, they're not going to

1    be able to afford a garage.

2    Q.   Would that make the vacancy rate that you would apply for

3    garage space higher or lower --

4    A.   Higher.

5    Q.   -- than -- what might be a typical vacancy rate that you

6    might assign for a garage space?

7    A.   I don't know.  In a blue collar neighborhood like this, to

8    use Mr. Schlesinger's words, it would be higher than in a

9    higher income neighborhood, simply because the people can't

10   afford a garage, they can barely afford their rent.

11   Q.   What vacancy rate did you use in your valuation?

12   A.   Five percent vacancy.

13   Q.   Could you just remind the Court, what was the valuation --

14   what was the final valuation you arrived at?

15   A.   I don't have my report in front of me.

16        MR. RAVERT:  Can we give the witness a copy of the

17   report?  This was previously marked as --

18   Q.   That was previously marked as exhibit 1.

19   A.   My value conclusion was 4,525,000.

20   Q.   And you used the five percent vacancy rate?

21   A.   Yes.

22   Q.   Okay.  Mr. Schlesinger testified that an appropriate cap

23   rate is between six -- is between four and six percent, do you

24   recall that testimony?

25   A.   Yes.

1  Q.   Do you think that that's a fair summary of cap rates for

2  apartment buildings in Brooklyn?

3  A.   Well, based on his own testimony he derived cap rates of

4  4.2 to 6.8 percent.  So four to six is a lower range than the

5  actual cap rates that he derived which, I might say, are based

6  on estimates.  You know, the estimated expenses of fifty

7  percent versus fifty-three percent which is the actual numbers

8  for the building provided by the owner of the building.

9       So every percentage affects the value.  You know, if you

10  had used the fifty-three percent cap rate he would have --

11  expense ratio, he would have come up with a lower number.

12  Q.   Uh-huh.

13  A.   So you see, every building is different.  You can't apply

14  one cap rate to every building.

15  Q.   Uh-huh.

16  A.   Every building has different locational characteristic, it

17  has different condition characteristics, it has different

18  market perception characteristics.  You know, I just learned

19  today that one of the creditors was Castle Oil so obviously the

20  landlord wasn't paying the oil company to provide oil to the

21  building.  When things like this happens, a building gets a

22  perception in the marketplace that affects what people will pay

23  for the building.

24  Q.   If you had used a lower cap rate, let's say six percent,

25  what would your valuation have come out to?

1    A.    5,655,583.

2    Q.    5,655,583?

3    A.    Yea.  But actually in my appraisal I had used an incorrect

4    water and sewer charge.  The owner's statement had the correct

5    water and sewer charge.  So my water and sewer expense was

6    understated.

7         If I had used the real water and sewer charge, which is on

8    the DEP website, the expenses would have been 14,892 higher,

9    resulting in an NOI of 324,458.

10   Q.    NOI being?

11   A.    Net operating income.

12   Q.    Thank you.

13   A.    Which when divided by a six percent cap rate would be

14   5,407,633.

15   Q.    So that brings it down a little bit.

16        MR. ROSENBLOOM:  How much was that number?

17        MR. RAVERT:  5, 4 --

18   Q.    I'm sorry, how much did you say?

19   A.    5,407,633.

20        THE COURT:  Okay.  I'm going to have to ask a question

21   here.  Can Mr. -- my notes indicate that Mr. Schlesinger said

22   that if he applied a 5.72 cap rate, which is the average of the

23   cap rates that he derived by examining the Comp, Inc. reports

24   for the comparables to the -- to the information in Mr.

25   Zachary's report that he came up with a 5,932,850 valuation.

1  So I'm not clear how -- what you're applying a six percent cap

2  rate to and arriving at 5,655,583 valuation.  Can somebody --

3  can you reconcile this for me?  Was Mr. Schlesinger looking at

4  something -- applying his hypothetical 5.72 cap rate to a

5  different multiplier?

6          Wait.  Okay.  You apply the cap rate to what?  You

7  multiply the cap rate to what to get the value?

8          THE WITNESS:  You divide the cap rate into the net

9  operating income and to the profit of the building.

10          THE COURT:  The net operating income.  So he was

11  obviously using different net operating income.

12          THE WITNESS:  I think -- I believe he used my net

13  operating income.

14          THE COURT:  Somebody has to explain this discrepancy

15  to me.

16          THE WITNESS:  Was in fact -- did you, in fact, use a

17  5.72 percent cap rate, Your Honor?

18          THE COURT:  I think that it's probably not appropriate

19  for you to have a colloquy with Mr. Schlesinger.

20          THE WITNESS:  Okay.

21          THE COURT:  I'm directing this to counsel, somebody

22  needs to explain this discrepancy to me, elicit testimony that

23  will explain this discrepancy, please.

24          MR. RAVERT:  Your Honor, I would be happy if Mr.

25  Rosenbloom wants to put Mr. Schlesinger back on the stand so he

1    can explain the derivation of that number, if that would help

2    us to move on.

3            THE COURT:  Okay.  So let's be clear then what you

4    applied your six percent cap rate to.  What was the -- what did

5    you divide -- what number did you divide that by?

6            MR. RAVERT:  Your Honor, I don't want to testify but

7    I'm happy to explain what I believe I just heard.

8            MR. ROSENBLOOM:  Your Honor, I'm going to object.  Let

9    him --

10            THE COURT:  Let me hear it from the witness, please.

11            MR. RAVERT:  Sure.

12            THE WITNESS:  The six percent cap rate was divided out

13    to a net operating income of 324,458.

14            THE COURT:  324,000 --

15            THE WITNESS:  458.

16            THE COURT:  458, and you divided -- you derived that

17    net operating income how?

18            THE WITNESS:  I used my net operating income in my

19    appraisal report but I adjusted it for the fact that my water

20    and sewer charge was too low.

21            THE COURT:  And the net operating income in the

22    appraisal report comes from where?

23            THE WITNESS:  It's on page 84 of my report.  It's the

24    bottom number 339,350.

25            THE COURT:  Right and that came -- I'm sorry; forgive

1    me if I'm going over ground that you covered previously but

2    that number came from what?

3            THE WITNESS:  That number came from deducting all the

4    expenses of the building and all the income of the building.

5            THE COURT:  And the income and expense numbers are

6    estimates or are these actual numbers that you received from

7    the owner?

8            THE WITNESS:  These are actual numbers.

9            THE COURT:  Okay.  Okay.  So that's 324,458 is the net

10   operating income, okay.

11           THE WITNESS:  Right.

12           THE COURT:  Okay.

13           THE WITNESS:  And when you divide that by six percent

14   it's 5,407,633.

15           THE COURT:  Okay.  All right.

16           MR. RAVERT:  May I continue?

17           THE COURT:  You can go ahead.  Thank you.

18   BY MR. RAVERT:

19   Q.   Mr. Zachary, do you agree with the use of a six percent

20   cap rate?

21   A.   No.  You asked me what the number would be if I had used a

22   six percent cap rate.

23   Q.   Right.  And what would be an appropriate cap rate?

24   A.   In my opinion the seven and a half percent cap rate would

25   be appropriate.

1    Q.    And based on this net operating income, if you used a

2    seven and a half cap rate, what would the value of the property

3    be, now that it's been adjusted for this water and sewer issue?

4    A.    4,326,106.

5    Q.    Mr. Zachary I'd like to ask you, there was considerable

6    discussion about comparable sales, how do comparable sales

7    typically factor into a valuation of real property?

8    A.    Well, it depends on the property type.  You know, for an

9    owner occupied one to four family house, for an owner occupied

10   industrial building the sales approach is very appropriate

11   because that reflects what other people are paying for similar-

12   type properties.

13         But for an income producing property the sales approach

14   just provides a range of what other people have paid for

15   properties like the subject.  The income approach is really the

16   more specific valuation approach to determine the value.

17              THE COURT:  Again, forgive me if I jump in here.

18   Isn't it true that comparables are often used -- are often more

19   instructive in terms of comparing your cap rate, testing your

20   cap rate, in the context of an income producing property?

21              THE WITNESS:  Uh-huh.

22              THE COURT:  You're looking at your comparables not so

23   much to look at the gross sales price but to see whether your

24   cap rate fits in with cap rates that have been -- that could be

25   derived -- that would -- that are reflected in other sales.

1          THE WITNESS:  That's true.  But if everybody knew

2     every cap rate of every sale, the range would be -- the range

3     of cap rates would be very high.  That's why people learn about

4     sales of apartment buildings and, you know, once they develop

5     four or five cap rates they, sort of, go with that.

6     BY MR. RAVERT:

7     Q.   Mr. Zachary, in this case why is it not appropriate to

8     simply use the average cap rate of those four comparable sales?

9     A.   Because obviously the participants in the marketplace that

10    paid a 4.2 percent cap rate versus a 6.8 percent cap rate you

11    can ask them why did you pay a 4.2 percent and why did you pay

12    a 6.8 percent cap rate.  There has to be a reason for it and

13    that reason has to do with the specifics of the property.  In

14    this case I believe somebody would use a seven and a half

15    percent cap rate because there is risk involved with these

16    units leased to Barons.

17         What if the city says --

18          THE COURT:  The risk is what?

19          THE WITNESS:  The risk is what if the city says we're

20    not going to lease -- we're not going to give you emergency

21    housing people any more.

22          THE COURT:  But Barons is tied in with a lease to the

23    owner.  Barons bears that risk, not the owner.

24          THE WITNESS:  I don't know the term of the lease, Your

25    Honor.

1          THE COURT:  True.

2          THE WITNESS:  I mean, it could be a one-year lease; it

3     could be a six month lease.  I mean, in my experience I've

4     known landlords that have rented to the city under emergency

5     housing on a handshake.  They have people that need to live in

6     an apartment but they don't have the time to process the

7     paperwork to come up with a lease or some kind of document and

8     landlords work on a handshake with the city.

9          THE COURT:  But in this case, I think the record in

10    this case reflects that the relationship in this case is not

11    between the owner of this building and the city but -- whether

12    it be a handshake or some other more formal arrangement, but

13    rather between a third party.

14         THE WITNESS:  No, but in my opinion and I don't know

15    this for a fact, Barons is just a conduit between the owner of

16    the property and the City of New York.

17         THE COURT:  Meaning what?  Meaning?

18         THE WITNESS:  Meaning Barons pays the landlord the

19    rent and Barons collects the rents from the city.  It's like

20    Baron rents the apartments and then they sublet the apartments

21    to the city.  I don't know this for a fact; I'm assuming this

22    is the way it works.

23         THE COURT:  But maybe what you're saying is that if

24    the city stopped supplying -- the tenants that you are making

25    the assumption that there would be a high likelihood that

1    Barons would then default in its obligations to the debtor?

2            THE WITNESS:  Yes.

3    BY MR. RAVERT:

4    Q.   Mr. Zachary, and what about the remainder of the

5    apartments, how does the presence of the Baron's lease affect

6    the remainder of the apartments, in terms of the perception of

7    risk I'm asking you?

8    A.   I mean, in my opinion and I've only heard about things in

9    the newspaper, you know, I've read about people complaining

10   about even Section 8 tenants living in their neighborhood.  So

11   in my opinion it's a negative.

12           To the remaining rent-stabilized tenants in the building

13   having emergency housing people is a negative characteristic.

14   Q.   In the course of your business do you have the occasion to

15   speak with other people in your field about such perceptions?

16   A.   Yes.

17   Q.   Or is this solely limited to your own perception?

18   A.   No, I talk to other appraisers.  I talk to real estate

19   brokers.

20   Q.   And are you saying that this is a general perception or

21   what is your testimony about this?

22   A.   Yes, in my opinion, based on discussions with various real

23   estate professionals, this is a general perception in the

24   marketplace.

25           THE COURT:  Sir, are you saying -- are you testifying

1    that the perception in the marketplace is that Section 8

2    tenants --

3              THE WITNESS:  No.

4              THE COURT:  -- or just -- are less desirable?

5              THE WITNESS:  No.

6              THE COURT:  Or that emergency housing Section 8

7    tenants?

8              THE WITNESS:  Correct.  Emergency housing Section 8

9    tenants.  I don't even know if that's the correct terminology.

10             THE COURT:  Let me ask you, and you may not know the

11   answer to this, but is there -- are -- is there more than one

12   emergency housing program at the city?  In other words, is

13   there an emergency housing program that places Section 8

14   tenants who have been displaced and then another emergency

15   housing program that places homeless people who just -- who

16   need shelter who may not necessarily be part of the Section 8

17   program?

18             THE WITNESS:  I don't know.

19   BY MR. RAVERT:

20   Q.   I'm sorry; what was the comment?  I don't know?

21   A.   I don't know.  Yes.

22   Q.   Uh-huh.  I have only one final question, Your Honor.  Mr.

23   Zachary, I -- Mr. Schlesinger testified that the presence of

24   terraces increases the value of the building.  Is that a

25   blanket truth?

1    A.    Well, in the case of a rent-stabilized building where the

2    rents are regulated it really has no affect.  I mean, you're

3    not going to get more rent from a rent-stabilized tenant

4    because the unit has a terrace.

5        And one of the hyperlinks to the Department of Buildings

6    violation showed one terrace where the concrete was crumbling

7    and falling down.  I think a repair was made to the subject for

8    that.

9        THE COURT:  I'm going to jump in here again, if I may.

10   You might not get more rent but you might -- but a tenant might

11   -- would it not be true or would it be true that a tenant might

12   choose -- with a choice between a rent-stabilized apartment

13   with a terrace and a rent stabilized apartment with no terrace

14   might choose the one with a terrace --

15       THE WITNESS:  Yes.

16       THE COURT:  -- even if you're not getting more rent

17   for it, you might have a lower vacancy rate as a result.

18       THE WITNESS:  Right.  Yes, it's called marketability.

19   The unit with a terrace is more marketable than a unit without

20   a terrace so it does affect.  But even several months ago this

21   man fell from his terrace because the railing wasn't attached

22   and Mayor Bloomberg told everyone don't go out on your terraces

23   until the Building Department inspects your building.

24       THE COURT:  So you're saying that for certain types of

25   families, maybe ones with small children, maybe a terrace would

1  be a negative?

2          THE WITNESS:  Yes.

3          MR. RAVERT:  I have no further questions, Your Honor.

4          THE COURT:  Let me ask you another question.  Why

5  didn't you -- didn't you test your cap rate by looking at the

6  cap rates that would be derived from other comparables and

7  wouldn't -- did you go through a process of looking at the cap

8  rates and saying -- and asking yourself well why is my cap rate

9  so different and are there factors that, present in this

10 building, that justify or explain why a seven and a half

11 percent -- a cap rate that is so divergent from the cap -- from

12 the range of cap rates that is -- that are reflected in the

13 comparable sales that you have provided in your appraisal

14 report?  Did you go through that analysis?

15         THE WITNESS:  Yeah.  Oh yes, I intentionally used a

16 higher cap rate because I felt that the history of the

17 building, with the Building Department and HBD and the

18 emergency housing repairs that were required, strongly

19 indicated that this was a problem building where emergency

20 housing repairs were done and that may just be the surface of

21 additional repairs that are required.

22         THE COURT:  But you didn't know what additional

23 repairs were needed, right?

24         THE WITNESS:  That's correct.

25         THE COURT:  Because you didn't go into the building.

1          THE WITNESS:  That's correct.  So I had to make a

2    valuation based upon the information that was available to me.

3          THE COURT:  Right.  Was it explained to you why you

4    weren't given access to the building to look at the interior of

5    it?

6          THE WITNESS:  It wasn't specifically explained to me

7    but I assumed it had to do with the fact that there's

8    litigation going on.

9          THE COURT:  Okay.  I have no other questions of you,

10   Mr. Zachary.  Do you have any other questions, Mr. Rosenbloom?

11         MR. ROSENBLOOM:  I do, Your Honor.  Just a few.

12   CROSS EXAMINATION

13   BY MR. ROSENBLOOM:

14   Q.   Mr. Zachary, you've spoken quite a bit about the Baron

15   lease, have you --

16         THE COURT:  Mr. Rosenbloom, I'm having trouble hearing

17   you.

18         MR. ROSENBLOOM:  I'm sorry.

19         THE COURT:  I think it would help me if you were by

20   the podium.

21         MR. ROSENBLOOM:  Sure.

22   Q.   Mr. Zachary, you've spoken quite a bit about the Baron

23   lease and its impact upon the building.  Did you review the

24   lease?

25   A.   No.

1    Q.    No.  So you have no idea what it says?

2    A.    The only thing I know about the Baron's lease is what you

3    said.

4    Q.    What I said?

5    A.    What you said, that the Baron's lease was really and

6    emergency city -- emergency housing.

7    Q.    Did you check the Baron website to find out any

8    information about Baron?

9    A.    I've seen -- yes, I saw the Baron's website.

10   Q.    And does it indicate --

11   A.    They're real estate brokers.

12   Q.    -- they're real estate brokers?

13   A.    Yes.

14   Q.    I see.  You didn't read the Baron lease you said, correct?

15   A.    No.  The lease was not provided to me.

16   Q.    It is on file with the Court.  It is a matter of public

17   record, do you know that?

18   A.    No, I don't.

19   Q.    Do you know that Baron is responsible to make all repairs

20   in the apartments?

21   A.    No, I don't.

22   Q.    Do you know that Baron is required to give time before

23   vacating?

24   A.    No, I don't.

25   Q.    Do you know that Baron is responsible to pay -- that Mr.

1  Baron is obligated to give a personal guarantee of the lease?

2  A.   No, I don't.

3  Q.   Now you said that every building is different, isn't that

4  correct?

5  A.   Yes.

6  Q.   Then why did you take a twenty percent across-the-board

7  deduction on all your comps?

8  A.   Well, the twenty percent was applied against the sale

9  price of the building.  The sale price of the building reflects

10  the differences between one building and another building.  One

11  building may sell for six million, one building may sell for

12  four million so the percentage is a way of applying a number to

13  all the buildings individually.

14  Q.   And in applying that number to all of the buildings did

15  you examine the conditions of each respective building to

16  determine what the appropriate amount or deduction, if any, was

17  appropriate?

18  A.   Yes.  Yeah, I did review the DOB website for each building

19  and all the buildings, contrary to what Mr. Schlesinger said,

20  had almost no violations.

21  Q.   Almost no violations.  Now, you mentioned something about

22  a terrace needing repair, correct?

23  A.   In the subject building?  Yes.

24  Q.   Yeah.  Do you have any idea whether that terrace was

25  repaired?

1    A.    Mr. Ravert told me that it was repaired and I believe you

2    told him that it was repaired.  And if you want to talk about

3    the garage --

4    Q.    I -- please -- I --

5    A.    I mean there's a building violation --

6          THE COURT:  You need to --

7    Q.    Can I ask you question rather than you providing

8    questions, Mr. Zachary?

9    A.    Okay.  Thank you.  Yes.

10   Q.    Please respond to my questions.

11   A.    On page 33 of my report there's the ECB violation for

12   failure to maintain a building defect, there's stucco

13   disconnected from fifth floor balcony, exposing steel

14   structure, apartment 5A.  Remedy, maintain building.

15   Q.    Gotcha.  And what's the date of that violation?

16   A.    6/18/2004.

17   Q.    Okay.  So over six years ago.

18         MR. ROSENBLOOM:  I have no further questions of this

19   witness, Your Honor.

20         THE COURT:  Let me ask you another question, then.  If

21   you had -- Mr. Rosenbloom asked you a series of questions about

22   the Baron lease and did you know that Mr. Baron -- that Baron

23   is responsible for repairs.  Did you know that Mr. Baron, the

24   principal I guess of this company, that there is a personal

25   guarantee that backs up that lease?  And so my question is, if

1     you had known these things, these facts that Mr. Rosenbloom

2     presented in his hypothetical question to you, would that have

3     altered your assessment of the impact of the Baron lease on the

4     value of this property?

5              THE WITNESS:  No.  Unless a lease is signed with a

6     credit tenant, they're truly not worth the paper it's written

7     on.  I mean, landlords have to rely upon the intrinsic value of

8     the building, its rental capabilities.  They can't rely on an

9     above-market lease guaranteed by anyone unless it's truly a

10    credit tenant.  And typically in the marketplace this is what

11    landlords -- what buyers do, what banks rely upon.  Every time

12    we appraise a property we compare the market rent to the

13    contract rent, even if it's a retail store, even if it has a

14    ten-year lease, it's a local pharmacy.

15             THE COURT:  I'm sorry; you're saying the Baron lease

16    is an above-market lease?

17             THE WITNESS:  No, I didn't say that.  In terms of the

18    creditworthiness that he's referring to, in terms of their

19    paying for the repairs and that sort of thing.

20             THE COURT:  Understood.

21             THE WITNESS:  But generally speaking we always --

22    appraisers always go to the market because that's the only

23    thing the landlord can rely upon.  What could he rent the store

24    or what could he rent an apartment for if the tenant moves out?

25    Because when a tenant is paying at above-market rent, I

1    guarantee you the tenant is going to go to the landlord and

2    say, you know what, I just found out the store across the

3    street is rented for a thousand dollars less than me, my rent

4    should be a thousand dollars less.  And if the landlord doesn't

5    agree to it, the tenant will give himself a rent deduction.

6    He'll fall behind in his rent.  He'll be two months behind

7    forever, which is effectively a rent discount.

8         MR. ROSENBLOOM:  Your Honor, just one comment.  Mr.

9    Zachary used a term that I think deserves defining.  He

10   mentioned, a couple of times, credit tenant and I'd just like

11   to have an explanation on the record about what that means.

12        THE WITNESS:  A credit tenant is someone like

13   Starbucks or McDonalds, usually a major corporation with a AAA,

14   AA, A, credit rating by some agency.  The United States

15   government is a credit tenant.

16        THE COURT:  Any other questions?

17        MR. ROSENBLOOM:  No, Your Honor.

18        THE COURT:  Okay.  You are excused, Mr. Zachary.

19        THE WITNESS:  Thank you.

20        THE COURT:  Are there any other witnesses that are

21   going to be called?

22        MR. RAVERT:  No, Your Honor.

23        MR. ROSENBLOOM:  No, Your Honor.

24        THE COURT:  I think that given the fact that we

25   haven't got a transcript of the first hearing yet, what I'm

1    going to need, rather than just a summing up, you know, an oral

2    summing up, I'm going to need to ask you to provide some post-

3    trial briefing.

4          I can give you a choice, I guess.  I could set this

5    down for an argument -- for us to -- for you to come in and

6    make an oral final -- oral closing statements or -- after the

7    transcripts have come in.  Or I could ask you to file post-

8    trial briefs.

9          MR. RAVERT:  Your Honor, I would be amenable to oral

10   closing statements after the transcripts are available.

11         MR. ROSENBLOOM:  Your Honor, I'm fine with that as

12   well, Your Honor.  And I respectfully submit that I'm not the

13   moving party here.  I think that the burden is on the moving

14   party to supply the Court with the transcripts.  I don't think

15   the debtor should have to bare that expense.

16         THE COURT:  I -- you know, who pays for the -- we'll

17   order the transcript, as far as that's concerned.  But you're

18   right, the burden's not on the debtor to provide the

19   transcript.

20         MR. ROSENBLOOM:  All right.  You know, I'm prepared

21   to, you know, give a closing at any time that the Court wants.

22         THE COURT:  Okay.  Well, I'm going to need to see the

23   transcript before it's going to be all that helpful to me.

24         MR. ROSENBLOOM:  Okay.

25         THE COURT:  And hopefully I'll be able to rule.

1    Maybe.  Hopefully.

2         MR. RAVERT:  I'm sorry; I didn't hear the last thing

3    you said, Your Honor.

4         THE COURT:  I said hopefully I'll be able to -- I'll

5    have a conclusion and I'll be able to rule after I hear your

6    closings.  I don't -- but I don't guarantee that.

7         MR. ROSENBLOOM:  Okay.

8         THE COURT:  So we'll pick a date.  I guess we're

9    figuring thirty days for the transcripts, right?

10        (No response)

11        THE COURT:  I'm thinking the latter part of February.

12        (Pause)

13        THE COURT:  So we'll give you March 3rd at -- is 2

14   o'clock all right?

15        MR. ROSENBLOOM:  Fine, Your Honor.

16        MR. RAVERT:  If you could just give me one second,

17   please?  March 3rd is fine.

18        THE COURT:  Uh-huh.

19        MR. RAVERT:  At 2 o'clock you said?

20        THE COURT:  Uh-huh.  All right.  Anything else?

21        MR. ROSENBLOOM:  No, Your Honor.

22        THE CLERK:  All rise.

23        (Whereupon these proceedings were concluded at 4:25 PM)

24

25

1

2                      I N D E X

3

4    WITNESS              EXAMINATION BY      PAGE

5    Victor Schlesinger  Mr. Rosenbloom      13

6    Victor Schlesinger  Mr. Ravert          48

7    Peter Zachary       Mr. Ravert          65

8    Peter Zachary       Mr. Rosenbloom      81

9

10                       E X H I B I T S

11   DEBTOR'S             DESCRIPTION                    PAGE

12   2                    Printout from Comps, Inc.      28

13   3                    Comp 2 in Mr. Zachary's Report  32

14   4                    Comps, Inc. Analysis of Mr.    34

15                        Zachary's Comp 3.

16   5                    Comps, Inc. Analysis Used in Mr.  35

17                        Zachary's Comp 4

18   6                    New York City                  45

19                        DOB Property Profile Overview

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Pnina Eilberg, certify that the foregoing transcript is a
true and accurate record of the proceedings.


_____

PNINA EILBERG (CET**D-488)

AAERT Certified Electronic Transcriber


Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501


Date: January 18, 2011